IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DERRICK TULLOUS, on Behalf of Himself and All Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>VS.<br><br>TEXAS AQUACULTURE PROCESSING COMPANY LLC, TEXAS AQUACULTURE COOPERATIVE, and ST DESIGN CORPORATION d/b/a PROSOURCE MANAGEMENT SOLUTIONS,<br><br>　　　　Defendants. | CIVIL ACTION NO. H-06-1858 |

## **OPINION & ORDER**

Pending before the court in this Fair Labor Standards Act case are two motions for summary judgment, one filed by defendants Texas Aquaculture Processing Company, LLC and Texas Aquaculture Cooperative (collectively, "Texas Aquaculture") (Doc. 59) and the other filed by defendant ST Design Corporation, d/b/a Prosource Management Solutions, ("ProSource") (Doc. 60). Plaintiff Derrick Tullous ("Tullous") has filed a response in opposition to each motion for summary judgment (Docs. 65 and 68). Texas Aquaculture has filed a response in opposition to ProSource's motion for summary judgment (Doc. 64). For the reasons explained below, the Court ORDERS that Texas Aquaculture's and ProSource's motions are DENIED.

I.　　Background & Relevant Facts

The dispute in this case is whether employees of a catfish processing plant are entitled to overtime compensation pursuant to Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. Fish farms exist along the Texas coast, and Matagorda County, Texas is the site of

1

many catfish farms in particular. Several of these catfish farmers formed a cooperative association, Texas Aquaculture, to process and package the catfish of each of the individual farmers. (*See* Klingaman Dep. at 22-23, Doc. 65 Ex. A). No catfish are raised at the processing plant. (*See id.*). Rather, each of the individual member farmers raise catfish on their own farms and sell the fish to Texas Aquaculture to process, package, and send to market. (*See id.* at 23-24). When the catfish are ready to be harvested, an individual farmer will hire a seining company to net the fish from his or her pond and load the fish onto a "live well" truck. (*Id.* at 25). The live well trucks are owned by independent trucking companies that are hired by Texas Aquaculture to transport live catfish from the farms to the processing plant. (*Id.*). Employees at the processing plant de-head, gut, and run the catfish through a processing machine that produces fillets. (*Id.* at 23-24). Texas Aquaculture, bearing the costs of processing, sells the processed fish to the end consumer, including restaurants, wholesalers, and other buyers, for a profit. (*Id.* at 24). Only member farmers' catfish are processed at the processing facility. (Hickl Aff. at 2, Doc. 59 Ex. C).

Approximately thirty independent farmers own Texas Aquaculture. (Klingaman Dep. at 27, Doc. 59 Ex. A). Although Texas Aquaculture is a separate legal entity,[1] the member farmers are extensively involved with its operation. When the cooperative was first established, the member farmers donated much of the equipment used by the processing plant. (*Id.* at 83-84; Hickl Dep. at 28-29, Doc. 59 Ex. B). Many of the farmers also donate significant time to the cooperative. (*See id.*; *see also* Hickl Aff. at 2, Doc. 59 Ex. C). Such involvement is not

---

[1] According to Texas Aquaculture's pleadings, Texas Aquaculture Processing Company, LLC was formed and began operating in 2002. (Texas Aquaculture's Mot. Summ. J. at 2, Doc. 59). The limited liability company was reorganized on or about October 16, 2002 as a Non-Profit Marketing Association under the Texas Cooperative Marketing Act, Chapter 52, Texas Agriculture Code and was renamed Texas Aquaculture Cooperative. (*Id.*). The court notes that there is little in the way of summary judgment evidence concerning the formation and function of Texas Aquaculture. Pleadings are not competent summary judgment evidence. *See Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996)

restricted by Texas Aquaculture's bylaws and is, if anything, encouraged. (Hickl Aff. at 2, Doc. 59 Ex. C).

Texas Aquaculture contracted with ProSource, a staff leasing agency organized under Texas law, to lease employees from ProSource to work at the fish processing plant. (*See* Staff Leasing Agreement, Doc. 60 Ex. J) (hereafter, the "Agreement."). While the Agreement was in place,[2] ProSource was responsible for, *inter alia*, payment of the leased employees' wages and benefits. (*See id.* at ¶ 4.3(a)). In doing so, ProSource performed the administrative functions of employment, such as payroll and workers' compensation insurance. (Traylor Dep. at 9-10, Doc. 60 Ex. A). Texas Aquaculture created a weekly summary of the hours each employee worked and submitted the summary to ProSource, which would then submit an invoice for Texas Aquaculture's approval. (*Id.* at 26). Once approved, ProSource processed the payroll. (*See id*. at 26-27). ProSource also maintained the employment records for the leased employees. (*Id.* at 54-55). Other than these payroll responsibilities, ProSource claims that it had little to do with the day-to-day operations of the processing plant. (*See* L. Baez Dep. at 34, Doc. 60 Ex. C; Cunda Dep. at 36-37, Doc. 60 Ex. H; Klingaman Dep. at 58, 67, Doc. 60 Ex. B; Tullous Dep. at 40, Doc. 60 Ex. F; G. Baez Dep. at 27, Doc. 60 Ex. G).

Nevertheless, ProSource did assume, pursuant to the Agreement, the "obligation" to "coordinate" with Texas Aquaculture in "the hiring, firing, disciplining, and reassignment" of the leased employees. (Agreement at ¶ 4.3(c), Doc. 60 Ex. J).[3] ProSource further reserved "the right of direction and control over the adoption of employment and safety policies[.]" (*Id.* at ¶

---

[2] The Agreement was terminated in 2006.

[3] ProSource alleges that direct hiring was done by supervisors at the processing plant and that it only learned about hiring decisions after the fact. (*See* Klingaman Dep. at 64, 78, Doc. 60 Ex. B; Castaneda Dep. at 47, Doc. 60 Ex. I). Moreover, Texas Aquaculture, not ProSource, decides an employee's starting salary and which job the new employee is assigned. (*See* Klingaman Dep. at 64-65, 69-70, Doc. 60 Ex. B). Employees did, however, fill out applications for employment with ProSource. (*See* ProSource Employment Appl., Doc. 68 Ex. E).

4.3(d)).  Indeed, employees at the processing plant were required to abide by ProSource's employment policies and procedures.  (*See* Klingaman Dep. at 40, Doc. 68 Ex. B; Employment Agreement at ¶ 2.1, Doc. 68 Ex. F; Agreement at ¶ 9.1, Doc. 60 Ex. J).  Furthermore, the Employment Agreement between ProSource and the leased employees refers to ProSource and the client company (to whom employees are leased) as "Co-Employers."  (Employment Agreement, Doc. 68 Ex. F).  Finally, if Texas Aquiculture terminated an employee, the employee remained "an employee of ProSource" and was subject to reassignment by ProSource.  (ProSource Unemployment Notice, Doc. 68 Ex. G).

      Hourly employees at Texas Aquaculture's processing plant are not paid time and a half for hours worked in excess of forty in a week.  Texas Aquaculture and ProSource dispute which entity was responsible for compliance with the requirements of the FLSA should the statute apply.  Texas Aquaculture contends that it hired "ProSource specifically to handle all of the payroll decisions," to determine "how to pay the employees," to determine whether "they were exempt or not exempt under the Fair Labor Standards Act," and to determine whether "they were entitled to straight pay or time and a half, overtime[.]"  (Klingaman Dep. at 108-109, Doc. 68 Ex. B).  Texas Aquaculture claims that it was ProSource's decision to classify the employees of the processing plant as exempt under the FLSA.  (*See id.* at 11).[4]

      ProSource disagrees with Texas Aquaculture's characterization.  Pursuant to the Agreement, Texas Aquaculture and ProSource agreed that Texas Aquaculture, not ProSource had the duty and obligation to comply with the FLSA.  (*See* Agreement at ¶ 4.4(d), Doc. 60 Ex.

---

[4]     Other managers of Texas Aquaculture have testified as their understanding that ProSource, not Texas Aquaculture, was responsible for determining if certain FLSA exemptions apply.  (*See, e.g.,* Hickl Dep. at 10-11, Doc. 64 Ex. E; Boswell Dep. at 14, Doc. 64 Ex. F).

J).[5] According to ProSource, it questioned Texas Aquaculture's alleged decision not to pay the leased employees overtime and asked that Texas Aquaculture provide it with written support. (Traylor Dep. at 14-16, Doc. 60 Ex. A). ProSource received documentation approximately a year later in the form of a fax containing copies of certain FLSA regulations dealing with overtime exceptions. (*See id.* at 16; *see also* Doc. 60 Ex. L). Thereafter, ProSource claims it accepted Texas Aquaculture's decision on the overtime issue. (Traylor Dep. at 16, Doc. 60 Ex. A).

Tullous brought suit, individually and on behalf of all others similarly situated, pursuant to the FLSA seeking to recover the unpaid overtime allegedly owed current and former employees of the fish processing plant. Texas Aquaculture has moved for summary judgment arguing that, because the fish processing plant is run by farmers for agricultural purposes, it is exempt from the FLSA's overtime requirements. ProSource has moved for summary judgment on the basis that it was not an "employer" for the purposes of the FLSA.[6] Alternatively, ProSource moves for summary judgment on statute of limitation grounds.[7]

II.     Legal Standards

        (1)     Summary Judgment

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and

---

[5] The Agreement further states that if a duty or obligation is not outlined in Article IV, then ProSource shall be deemed the "sole employer" with respect to, *inter alia*, the payment of wages. (Agreement at ¶ 4.6, Doc. 60 Ex. J). As stated above, Article IV requires Texas Aquaculture to comply with the FLSA, but it does not specifically state whether Texas Aquaculture or ProSource is responsible for determining the application of the FLSA or its exemptions.

[6] ProSource also adopts by reference the exemption arguments advanced by Texas Aquaculture in its motion for summary judgment. (ProSource's Mot. for Summ. J. at 26-27, Doc. 60).

[7] Texas Aquaculture adopts by reference the statute of limitation arguments advanced by ProSource in its motion for summary judgment. (Texas Aquaculture's Resp. at 12, Doc. 64). Texas Aquaculture opposes, however, ProSource's contention that ProSource was not an "employer" for FLSA purposes.

admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v.*

*Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." W*ebb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace*, 80 F.3d at1046 (citing *Little*, 37 F.3d at 1075). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the

existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1988).

>> (2) The Fair Labor Standards Act

The Fair Labor Standards Act was enacted to eliminate the existence of "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" in industries engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 202. Employees engaged in commerce or in the production of goods for commerce or those employed in an enterprise engaged in commerce or in the production of goods for commerce are protected by the overtime provisions of the FLSA, which require that these employees be paid one and one-half times their regular rate of pay for hours they work in excess of forty in a workweek. 29 U.S.C. § 207(a).

The FLSA sets forth various exemptions to its overtime provision, one of which is an exemption for "any employee employed in agriculture." 29 U.S.C. § 213(b)(12). However, exemptions are to be narrowly construed against the employer seeking to assert them, and the burden of proof is on the employer to establish that an exemption to the FLSA applies. *See A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295 (1959).

III. Analysis

Three issues are before the court on the resolution of the pending motions for summary judgment: (1) whether the employees of Texas Aquaculture and/or ProSource are

employed in agriculture; (2) whether ProSource qualifies as an "employer" for the purposes of the FLSA; and (3) whether portions of the employees' claims are barred by the statute of limitations. The court addresses each issue in turn.

> (1) Agriculture Exemption

"Agriculture," as the term is defined under the FLSA, includes:

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . . the raising of livestock, bees, fur-bearing animals, or poultry, and any practices . . . performed by a farmer or on a farm as incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f). Two categories of exempt agricultural practices exist under this statutory definition: primary agriculture and secondary agriculture. *See Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762-63 (1949); 29 C.F.R 780.105. Primary agriculture encompasses the first half of the statutory definition and includes specific farming operations such as, *inter alia*, cultivation and tillage of the soil, dairying, cultivation, growing, and harvesting. *Farmers Reservoir*, 337 U.S. at 762; 29 C.F.R. 780.105(b). Secondary agriculture covers the second, broader half of the definition and includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm as an incident to or in conjunction with "such" farming operations. *Farmers Reservoir*, 337 U.S. at 762-63; 29 C.F.R. 780.105(c).

"Among other things, a practice must be performed *by a farmer* or on a farm in order to come within the secondary portion of the definition of 'agriculture.'" 29 C.F.R. § 780.130 (emphasis added); *see also Farmers Reservoir*, 337 U.S. at 767. Employees of a farmers' cooperative association are *not* generally engaged in any practices "by a farmer" unless

9

the association itself is engaged "in actual farming operations to an extent and under circumstances sufficient to qualify as a 'farmer.'" *See* 29 C.F.R. § 780.133. As the regulations explain,

> [e]mployees of a farmers' cooperative association . . . are employed not by the individual farmers who compose its membership or who are its stockholders, but by the cooperative association itself. Cooperative associations[,] whether in the corporate form or not, are distinct, separate entities from the farmers who own or compose them. The work performed by a farmers' cooperative association is not work performed "by a farmer" but for farmers.

*Id.* at § 780.133(a). Thus, Texas Aquaculture must itself engage in "actual farming operations" sufficient to qualify as a "farmer" to invoke the secondary agriculture exemption.

To satisfy this requirement, Texas Aquaculture argues that it is part of an "over-all agricultural enterprise" sufficient to qualify as a "farmer" because the catfish processing plant is a necessary and cost-effective way for the catfish farmers to bring their fish to market and because the farmer-members are intimately involved in the operation of the cooperative association. "[T]he question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity." *Farmers Reservoir*, 337 U.S. at 761-62. In *Farmers Reservoir*, the issue presented was whether the employees of a corporation engaged in the collection, storage, and distribution of irrigation water to local farmers were "employed in agriculture." 337 U.S. at 756. The irrigation company was mutually owned by farmers and served only its member-farmers. *Id.* The Supreme Court held that the irrigation company was an independent entity whose employees were not engaged in agriculture, observing as follows:

10

> There is a difference between the hiring of mutual servants by a group of employers and the creation by them of a separate business organization, with its own officers, property, and bonded indebtedness, which in turn hires working men. Those working men are in no real sense employees of the shareholders of the organization. They are hired by the organization, fired by the organization, controlled and directed by the organization, and paid by it. The fact that the organization is a corporate one adds to the picture but is not controlling. The controlling fact is that the company has been set up by the farmers as an independent entity to operate an integrated, unitary water supply system. The function of supplying water has thus been divorced by the farmers from the farming operation and set up as a separate and self-contained activity in which the farmers are forbidden, by the company's by-laws, to interfere. Those employed in that activity are employed by the company, not by the farmers who own the company.

*Id.* at 768. In this case, Texas Aquaculture appears to be a separate entity, independent from the catfish farmers who own it and would not come, therefore, within the secondary meaning of agriculture because their work is not performed "by a farmer or on a farm."

Indeed, a similar conclusion was reached in *Hodgson v. Idaho Trout Processors Co.*, 497 F.2d 58 (9th Cir. 1974), which also involved a fish processing plant that was owned and operated by several member farms. In *Hodgson*, a trout processing facility, Idaho Trout Processors Company ("Trout Processors"), was incorporated for the purpose of cleaning, processing, freezing, packing, and marketing trout raised by three trout farms, which were the company's only stockholders. *Id.* at 59. Trout Processors did not raise trout itself, but rather operated the processing facility where the member farms had their trout processed. *Id.* Trout Processors leased the land for its plant from an entity whose sole shareholder was one of the farmers on one of the member farms. *Id.* The plant was not located on any of the member farms' lands. *Id.* After deducting the processing and marketing expenses of Trout Processors, the proceeds of the trout sales were distributed to the three member farms on a percentage basis. *Id.* Employees of Trout Processors brought suit under the FLSA, and Trout Processors, like

11

Texas Aquaculture here, claimed that the agriculture exemption applied. The Ninth Circuit held that the activities of the employees of Trout Processors did not come within either the primary or secondary meaning of agriculture. *Id*. at 59-60. First, the court determined that the activities did not come within the primary meaning because processing operations "do not consist of any of the elemental farming operations set forth in [the FLSA's definition of "agriculture"]." *Id*. Second, the court concluded that activities did not come within the secondary meaning because "the work [was] not performed "by a farmer or on a farm" as an incident to or in conjunction with farming operations." *Id.* at 60. Finally, applying *Farmers Reservoir*, the court rejected Trout Processor's argument that the processing operation was so integrated with the farming activities of the three farms that it was still a part of the over-all farming function:

> From the stipulation of facts it appears that Trout Processors was set up as an independent entity to clean, process, freeze, pack, and market trout from the three member farms and others, that its employees are employed directly by it, and that the member farms do not interfere with its operations. The case is thus governed by *Farmers Reservoir & Irrigation Co*.

*Id*. Similarly, in this case, Texas Aquaculture is set up as a separate, cooperative association to process and package the catfish of its member farmers. It does not raise catfish itself. Nor is Texas Aquaculture's processing facility located on any of its member farmers' farms. Thus, it appears that the reasoning of *Farmers Reservoir* and *Hodgson* govern and that FLSA's agriculture exemption does not apply to Texas Aquaculture's employees.

Texas Aquaculture attempts to distinguish *Farmers Reservoir* and *Hodgson* by arguing that its member-farmers are involved in the management of the processing plant and have not "divorced themselves" from the operation of the cooperative association. At the very least, genuine issues of material fact as to Texas Aquaculture's independence, or lack thereof,

preclude summary judgment at this time. Accordingly, Texas Aquaculture's motion for summary judgment is denied.

>   (2)   ProSource's Status as an "Employer"

Under the FLSA, an "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). A FLSA employer must comply with the FLSA's requirements for all the workers it "employs," a term defined as "includ[ing] to suffer or permit to work." 29 U.S.C. § 203(g). For the purposes of the FLSA, the term "employer" has been broadly interpreted and may include one or more joint employers depending on the nature of the relationship between the employers. *Falk v. Brennan*, 414 U.S. 190, 195 (1973); 29 C.F.R. 791.2(a).

"Whether a party is an employer or joint employer for purposes of the FSLA is essentially a question of fact[.]" *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983). To determine joint employer status, the court should examine the "economic realities" of the relationship between the alleged employer and employee. *Id.* at 195. Some of the relevant factors under the economic realities test are whether the alleged employer: (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).[8] No one factor is dispositive. Instead, the ultimate determination of the employment relationship depends "upon the

---

[8] The Fifth Circuit has also applied a similar five-factored test, which asks the following questions: "(1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment conditions of the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?" *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968).

circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

In this case, genuine issues of material fact preclude a summary judgment determination that ProSource was not a joint employer with Texas Aquaculture. The Agreement between ProSource and Texas Aquaculture specifically permitted ProSource's involvement in the hiring, firing, and disciplining of the leased employees. Moreover, the leased employees submitted applications for employment with ProSource and signed employment agreements which gave ProSource the power to terminate the employees. Indeed, if Texas Aquaculture terminated a leased employee, that employee remained "employed" by ProSource. Furthermore, the parties vigorously dispute the entity responsible for determining whether the employees received overtime. This disputed fact has implications for all of the factors listed above, and, at the very least, demonstrates that ProSource's role may have been more than merely ministerial or administrative.[9] Finally, it is undisputed that ProSource maintained the employment records. A reasonable jury could conclude that ProSource was a joint employer with Texas Aquaculture, and summary judgment is not appropriate at this time.

(3) Statute of Limitations

A cause of action under the FLSA must be commenced within two years of the cause of action accrues. 29 U.S.C. § 255(a). Nevertheless, a three-year statute of limitations applies for "willful" violations of the FLSA. *Id.* A violation is "willful" if an employer "knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute." *Singer v. City of Waco*, 324 F.3d 813, 821 (5th Cir. 2003) (citations and internal quotations omitted).

---

[9] This fact also distinguishes *Beck v. Boce Group, L.C.*, 391 F. Supp. 2d 1183 (S.D. Fla. 2005) (finding that a defendant, which had leased employees to other defendants, was not a joint employer despite the fact that it had consulted with other defendants on employment issues and required the distribution of an employee handbook), the case upon which ProSource heavily relies.

14

Here, the issue of whether ProSource "willfully" violated the FLSA turns on disputed questions of fact. First, ProSource and Texas Aquaculture dispute which entity was responsible for complying with the FLSA requirements. Second, ProSource admits that it "felt like from the beginning that [Texas Aquaculture] should have been paying overtime." (Traylor Dep. at 15, Doc. 60 Ex. A). A reasonable jury could conclude that ProSource "knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute." Summary judgment on the limitations issue must be denied, at this time.

IV.     Conclusion

For the reasons explained above, it is hereby

ORDERED that Texas Aquaculture's motion for summary judgment (Doc. 59) and ProSource's motion for summary judgment (Doc. 60) are DENIED. It is further

ORDERED that the parties are referred to Magistrate Judge Stacy for a new scheduling order.

SIGNED at Houston, Texas, this 30th day of September, 2008.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE